Filed 4/8/13  In re Jasmine F. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re JASMINE F., a Person Coming Under the Juvenile Court Law. | B243270 (Los Angeles County Super. Ct. No. CK91596) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. LUCY F., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Veronica McBeth, Judge.  Affirmed.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Stephen D. Watson, Senior Associate County Counsel for Plaintiff and Respondent.

# I.  INTRODUCTION

The mother, Lucy F., appeals from the juvenile court's July 6, 2012 jurisdictional and dispositional findings and orders as to her.  The mother does not challenge the jurisdictional findings as to the father, Frank F.  But she argues there was insufficient evidence to support the juvenile court's findings that she knew of the sexual abuse of an unrelated child by the father and failed to protect her daughter, Jasmine F.  The mother challenges the juvenile court's jurisdiction under Welfare and Institutions Code section 300, subdivisions (b) and (d).[1]  In addition, the mother contends the juvenile court erred in removing Jasmine from her custody.  We affirm the jurisdictional and dispositional findings and orders.

# II.  PROCEDURAL HISTORY

On January 27, 2012, the Department of Children and Family Services (the department) filed a section 300 petition on behalf of 14-year-old Jasmine F.  The petition alleged the father, Frank F., sexually abused two unrelated children, Gisselle V. and Juana C.  The father allegedly fondled Gisselle V. on numerous prior occasions when she was 9 or 10 years old.  On two prior occasions, the father fondled 15-year-old Juana  C.  The mother knew of the sexual abuse of the girls by the father and failed to protect Jasmine.   The mother allowed the father to reside in the home and have unlimited access to Jasmine.  The sexual abuse of the unrelated children by the father and the mother's failure to protect Jasmine endangered the child's physical health and safety and placed the minor at risk of physical harm, damage, danger, sexual abuse and failure to protect.

At the January 27, 2012 detention hearing, the juvenile court ordered the child placed with the maternal grandparents with temporary placement and custody vested with the department.  The parents were granted monitored visits with the child.  The

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

department was ordered to inquire whether maternal grandmother would agree to serve as a monitor for the parents' visits. In addition, the department was ordered to provide the parents with no cost or low cost referrals for individual counseling. The department also was ordered to provide the child with individual counseling.

At the July 6, 2012 jurisdiction and disposition hearing, the juvenile court found the child was a dependent of the court under section 300, subdivisions (b) and (d). The court amended and sustained the following b-1 and d-1 counts of the petition: "On prior occasions, [the father] sexually abused unrelated child [Gisselle V.]. On numerous prior occasions, the father fondled the unrelated child Gisselle V.'s breast and vagina when the unrelated child was 9 or 10 years old. On 01/17/12, the father was arrested for Lewd Act with a Child. The mother . . . knew of the sexual abuse of the unrelated child. The mother allowed the father to reside in the child's home and have unlimited access to the child. The sexual abuse of the unrelated child by the father, and the mother's failure to protect the child, endangers the child's physical health and safety and places the child at risk of physical harm, damage, danger, sexual abuse and failure to protect."

The juvenile court ordered Jasmine to remain in her maternal grandparents' custody and to participate in individual counseling. The court ordered the parents to attend conjoint counseling with each other. The mother was to participate in individual counseling, including sexual abuse awareness counseling. The father was to participate in individual counseling to address case issues and sex abuse counseling for perpetrators. The parents were granted monitored visits two or three times for two to three hours per visit by a neutral monitor. The department was ordered to provide the parents with no cost and low cost referrals.

3

III.  EVIDENCE


A.  Detention Report


The January 27, 2012 detention report, which was prepared by Children's Social Worker Narine Agopoglu, included three police reports from the Huntington Park Police Department.  On January 19, 2012, Ms. Agopoglu received a referral from Detective Macias who was investigating sexual abuse allegations made against the father.  Detective Macias was concerned Jasmine was a possible victim of sexual abuse based on the father's behavior towards two girls -- Juana C. and Gisselle V. -- and, Maria R., the family's adult housekeeper.

On January 3, 2012, Officer Gonzalez contacted Juana C. after a group home staff member reported the suspected sexual abuse to the Huntington Park Police Department Juana  C. stated on December 31, 2011, she, the mother and father (who were her former foster parents), her brother Carlos, and two other foster brothers went to a New Year's Eve party.  On the way home, the father was seated to Juana C. 's right.  Once they arrived at the family residence, the father placed his left hand on Juana C. 's right leg for support as he got out of his seat to open the gate.  The father's hand grazed Juana C. 's private area over her skirt.  Juana C. stated it was an accident and the father had never touched her in a sexual or inappropriate manner before.  Juana C. also reported the father touched her right armpit and breast for a split second when she walked by him as he was trying to reach for a cup on a shelf.  She stated the incident also was an accident.  Juana C. reported she loved her foster parents.  She said the father and mother were good people that cared for her and all the other foster children.  Juana C. had never seen the father do anything inappropriate with her brother Carlos or any other child in the home.

On January 10, 2012, Officer E. Cobian conducted a follow-up interview with Juana C.  She said her statements to Officer Gonzalez were truthful except the father intentionally grazed her genitals over her underwear.  Juana C. apologized for not being

4

fully truthful with Officer Gonzalez. She also stated the incident where the father grazed her right armpit and breast was an accident.

In addition to the allegations made by the foster child Juana C., the police also spoke to another victim, Gisselle V. Gisselle V. stated she knew the family for many years and regularly visited Jasmine. Gisselle V. reported, one time when she was 9 years old, the father fondled her breasts while driving her home, placing his hand under her shirt and bra. Gisselle V. continued to visit Jasmine and never told anyone about this incident. Gisselle V. told Detective Macias she was afraid the father might do something to her if she told someone about it but admitted he never threatened her.

Gisselle V. stated the molestation spanned one year and occurred about 20 times. She reported the father would fondle her even when Jasmine was in the car. The father would pretend to stretch, reach behind, and place his hand between her legs. Gisselle V. moved to try to avoid the father but he would still reach over to touch her. On one occasion while driving her home, the father grabbed her left hand and pulled it towards his groin but she pulled her hand away. Another time, Gisselle V. was walking through a hallway when the father came out a bedroom and grabbed her by her arm. He attempted to pull her into one of the bedrooms. Gisselle V. resisted by holding on to a wall. The father eventually gave up and released her.

On another occasion, Gisselle V. was in the pool attempting to float in the water, face up. The father approached her. He held her head with one hand and rubbed her genitals over her clothing with his other hand. The child quickly swam away when she felt his hand.

About a year after the first incident happened, Gisselle V. confided in two of her friends, Isis and Michelle, about the abuse. Her friends told their respective parents who in turn contacted Gisselle V.'s mother. Once Gisselle V.'s mother, Maria S., learned of the molestation, she did not allow her daughter to visit Jasmine again. Gisselle V. stated her mother was going to speak with the father and mother about the allegations but she did not know if her mother ever did.

5

Gisselle V. also stated Jasmine had disclosed that the father accidently touched Jasmine's genitals while she was in the swimming pool. Detective Macias interviewed Jasmine regarding Gisselle V.'s allegation. Jasmine denied the allegation and stated she never told Gisselle V. that her father had touched her. Jasmine reported some time back Gisselle V. confided the father had molested Gisselle V. Jasmine stated she did not believe the allegations. Jasmine believed Gisselle V. wanted attention because she grew up without a father. Jasmine told her father and mother about the allegations Gisselle V. made but nothing was done about it. While Detective Macias was interviewing Jasmine, the mother barged into the room. The mother stood directly over Jasmine, grabbed Jasmine's face, and told the child, "Remember what I told you!" Detective Macias asked the mother to leave the room and she reluctantly did so. But the mother watched the interview through the window. Detective Macias asked Jasmine if the mother had threatened her or told her not to say anything to him. Jasmine appeared afraid but stated no.

Detective Macias interviewed Gisselle V.'s mother, Maria S., over the phone. Maria S. stated about three years ago, Isis' mother told her of the abuse involving Gisselle V. Maria S. did not know what to do. She was afraid the child would be taken away from her and she did not want to ruin her chances of becoming a legal resident. Once Maria S. knew of the abuse, she did not allow the child to visit the family anymore.

Detective Macias also spoke with another victim, Maria R., who was the family's housekeeper. Maria R. was hired by the mother in August 2010 to clean the family's house. On February 18, 2011, she was feeding the dog when she felt someone grab her waist. Maria R. was startled and jumped up. She turned around and saw the father standing behind her. The father asked if he had scared Maria R. and she replied yes. A few minutes later, the father rubbed against her when she was washing dishes. The father asked again if he had scared Maria R. and she told him yes. Maria R. later was removing clothes from the dryer when the father grabbed her waist. She jumped, yelled at him to stop touching her, and walked away. Maria R. next walked over to the refrigerator to clean it. As she was cleaning, the father placed his left hand on her left shoulder and

6

groped her right breast with his right hand. He quickly brought his left hand towards her genitals and groped it. Maria R. jumped up and ran from the father. She retrieved her purse, ran to a friend's house, and asked her friend for a ride home.

A day or two later, Maria R. told the mother what had happened and the mother apologized to her. The mother arranged a meeting between the three of them. During the meeting, the father apologized to Maria R. and the mother. The father stated he did not know why he groped Maria R. and promised it would not happen again. After the meeting, Maria R. continued to work for the family because she needed the money. She avoided contact with the father as much as possible and the father never bothered her again.

Maria R. stated she felt guilty later when she learned that a crime report has been filed alleging that the foster child, Juana C., had been molested by the father. She got to know Juana C. when the child lived at the home and dealt with the teenager on a regular basis. Maria R. believed if she had initially reported her incident to the police, the father would never have had access to Juana C.

After Maria R. reported the father's inappropriate behavior to the police on January 12, 2012, the mother became upset with Maria R. and sent her numerous text messages. The text messages noted Maria R. was undocumented and warned her to be careful because social services could be involved in Maria R. 's life. Detective Macias called the mother and advised her not to contact Maria R. The mother apologized for sending the text messages and promised not send any more messages. But later in the day, Detective Macias received another call from Maria R. stating the mother continued sending text messages to her.

During the interview with Detective Macias, Maria R. gave him a letter that she found in the trash that had been written by the mother. A copy of the letter is attached to Detective Macias' report. The letter is dated February 22, 2011, the same day Maria R. had her meeting with the mother and father. The letter is addressed to the father and states: "Dear Frank, my heart is broken again because you have failed me. Why do you hate me so much. Why would you continue with this behavior. We have lived some

7

wonderful years and I thank God for that. I remember when Mitchell, Miguel's friend, told me what you did and how you refused to confront the situation. Then Veronica [,] my cousin[,] you also did something to her. Then came Sandra, my other cousin, whom you also rubbed your body against her and would always be staring at her. Then Gisselle [,] what exactly did you do to her don't really know but her mom could have pressed charges. Did you do the same thing to Maria and Norma, it makes me wonder. Then the worst of the worst was in 2008 when you now have admitted to doing in my own home with Betty. I gave you the benefit of the doubt cause you were drunk but you really know what you did. How sad to have such a [horny] husband. This is an ongoing problem for you. I don't know how I can help you."

The mother admitted to Detective Macias she wrote the letter. She intended to give the letter to the father but never did. The mother explained Miguel was her brother and Mitchell/Michelle was Miguel's girlfriend about 20 years ago. According to the mother, Michelle was very flirtatious. On one occasion, the father was drunk and "messed around" with Michelle. When asked about her cousin Veronica, the mother said the father once went to Veronica's home to pay the rent. Veronica accused the father of looking at her while she was dressing. The mother's other cousin, Sandra, accused the father of "looking" at her while she was cleaning. The mother blamed Sandra for dressing provocatively. The mother explained Maria and Norma were her previous babysitters. The mother claimed they never alleged any inappropriate conduct by the father. When asked about Betty, the mother replied Betty was a former friend of hers. The mother believed the father and Betty "messed around" on one occasion.

The mother told Detective Macias that Gisselle V. was her younger daughter's friend. About four years ago, she heard Gisselle V. was being mean to her daughter over the internet. The mother stated Gisselle V. called the father a pervert because he carried Gisselle V. on his shoulders. The mother was aware Juana C. had alleged the father touched her inappropriately but the mother did not know the specific allegations because no one had spoken to her about them.

8

Detective Macias also interviewed the father. The father stated he had admitted to his wife that he had touched the housekeeper. The father reported it occurred about one year ago inside his home. Maria R. was standing by the refrigerator when he walked up behind her and touched her left hip with his hand. The father said Maria R. appeared startled. When asked why he touched Maria R., the father said he wanted to let her know he was behind her. The father did not know why he did not announce his presence verbally. The father laughed when told about Maria R. 's allegations and stated they were untrue. He offered to take a polygraph test to prove his innocence. But when Detective Macias offered the father a polygraph test, the father's face became flushed and he stated he needed to speak with someone before taking it. The father also declined to sign a consent form to take the polygraph test at a later time.

Detective Macias also interviewed the mother's cousin, Veronica M., by phone. When asked if Veronica knew the father, she replied "The child molester?" Veronica stated about 20 years ago, she lived in the same apartment complex as the mother but not in the same apartment. The apartment complex is owned by Veronica's father. One late summer evening, Veronica was home alone. Because it was hot, she was naked in her apartment. Veronica was startled by the father, who entered her apartment unannounced. She believed she might have left the door unlocked. Veronica thought the father entered the apartment with the intent of doing something to her. She screamed and the father looked surprised. She continued screaming and the father left her apartment. Veronica called the Los Angeles County Sheriff's Department and the father was arrested for trespassing. Detective Macias did a background check of the father and confirmed the father was arrested for trespassing on September 1990. Veronica stated she avoided all contact with the father when possible.

Detective Macias also spoke with Miguel V., the paternal uncle. Miguel stated Michelle was his girlfriend over 20 years ago. The father and Michelle kissed once in 1987. Miguel was aware his cousin Veronica had confronted the mother because the father had done something to Veronica. He also discussed the father's behavior with his cousin, Sandra, who currently lives in Mexico and is over 30 years old. Miguel stated

9

about 20 years ago, Sandra was visiting from Mexico. Sandra accused the father of grabbing her buttocks. Miguel stated the father had a problem keeping his hands to himself and was known for doing inappropriate things.

On January 19, 2012, Ms. Agopoglu arrived at the family home with Huntington Park Police Officers Gallegos and Cobian, and Detective Macias. Both parents denied the allegations. But the parents signed a safety plan for the father to move out of the home and stay with a paternal aunt, Martha P., during the investigation. The father stated the paternal aunt did not have any children residing in her home. Later, the police arrested the father on the same day.

On January 23, 2012, Ms. Agopoglu called the mother to request maternal grandparents' home address for a home assessment. The mother reported she was planning to bail out the father as soon as a bail amount was posted. She stated: "Frank needs to work. We need the money and we have to pay for things." The mother also stated, "I just want you to know that I took my daughter to see a therapist on Friday and she told the therapist that she does not want her father to be removed from home because it is going to cause a huge financial distress on the family." On January 26, 2012, the mother called to report she had bailed out the father.

## B. Jurisdiction and Disposition Report

The March 7, 2012 jurisdiction/disposition report was prepared by Dependency Investigator Laura Castro. The report indicated the child remained in the maternal grandparents' care. On February 22, 2012, Ms. Castro interviewed Jasmine about the allegations in the petition. Jasmine denied being touched inappropriately by the father or witnessing any inappropriate behavior from him. Concerning Gisselle V.'s allegations, Jasmine stated: "He was like a father to her. I don't believe [it's] true. I have never seen anything. I never told her that he touched me. I think the detective was saying that so I would say something. I doubt she said anything."

10

Ms. Castro interviewed the mother on February 24, 2012. The mother denied the allegations in the petition. The mother reported on January 20, 2011, Maria R. disclosed the father had sexually harassed her two to three times. The mother stated: "I asked her what did she mean by it and she responded that he was too close to her. When my husband arrived I confronted them and he denied being inappropriate. I remember being upset and I told her if this happened again to call the police." The mother indicated Maria R. placed a pen and paper in front of the mother and told her to write her frustrations down. The mother stated: "It was a silly idea and I decided to stop writing it and I put it away. I wasn't going to give him the letter." The mother reported she left on vacation for a week and gave Maria R. unlimited access to the house. The mother said, "During this time she told me she had cleaned out my closets. That is where I was storing the letter and she found and took it. She had stolen the letter." The mother believed Maria R. was jealous of her and made up the allegations. When Ms. Castro asked the mother about other victims, the mother redirected the conversation back to Maria R. The mother again stated the housekeeper was being vengeful and was possibly jealous of her. On February 27, 2012, Children's Social Worker Vanessa Acosta reported the mother continued to deny the allegations and remained protective of the father. Ms. Acosta was concerned for the child because the mother did not believe any sexual abuse occurred and the father remained in the family home.

The former foster child, Juana C., also was interviewed. Juana C. reported two incidents of inappropriate touching by the father. In the first incident, the father caressed her legs. The second incident occurred when they returned home from a party. Juana C. stated the father put his hand up her skirt and touched her genitals over her underwear. Juana C. stated she had never seen the father be inappropriate with other children in the home.

Maria R., the housekeeper, was also interviewed. She stated: "Yes, everything I said happened and I am willing to testify. This happened on February 18, 2011 and I was working as usual. I was feeding the dogs and I felt him [the father] grab me from the waist. Then when I was washing dishes I felt [the father] rubbing against me. Then in

11

the bedroom I felt him too close and I told him he was making me feel uncomfortable. When I was taking out the clothing from the dryer he grabbed my waist and I verbally said to him to stop and walked away. This did not stop. When I was cleaning the refrigerator he placed his hand on my shoulder then reached to touch my breast and then grabbed my vagina. I left the house immediately. A few days later I told his wife since she was the one that had given me employment and she confronted [the father] about the incident. I am going to be honest. Since that incident nothing else has happened."

## C. Interim Review Report

The May 7, 2012 interim review report, prepared by Ms. Castro, indicated the child remained in her maternal grandparents' care. The parents had weekly monitored dinners on either Sunday or Monday with the child for up to two hours. The department did not recommend placement of the child in the mother's home because the mother continued to believe the sexual abuse allegations were fabricated and false. Ms. Castro wrote: "Since the detention hearing 01/27/2012, mother . . . continues to be in denial and is protective of father . . . Mother . . . stated [the father] is innocent. Such statements only demonstrate for the past 4 months, mother has not made any progress in learning the skills of sexual abuse awareness to protect her daughter. . . ."

The interim review report included a Multidisciplinary Assessment Team report. The team interviewed the child, the parents and the maternal grandmother. Jasmine has three adult siblings, two brothers and a sister. The child's 18-year-old brother lives with the parents.

The parents have known each other for 35 years and have been married for 21 years. The mother is a registered nurse for Los Angeles County. She has been a foster parent since August 2010. Since the detention, the mother has had difficulty with sleeping, eating, fatigue and nervousness. The father is employed as a mechanic and works nights. Since the detention, the father has experienced stress and difficulty with sleeping and eating. The mother noticed the father was withdrawn and expressed concern

12

for him.  She stated:  "The main thing for me is how is he going to be able to function normally.  The trauma for him to be charged with such a hideous crime.  I worry about the trauma he is going to endure?  He needs to get some type of normalcy.  I've always been the strong one in the relationship."  The parents stated their three foster children were removed from their home.  The parents believe the foster children have been impacted by the detention.

The mother stated prior to the detention, she would communicate with Jasmine through phone calls and text.  Now, the child will not answer her cell phone, will hang up on the mother, and will not respond to the mother's text messages.  Before the detention, the mother knew where Jasmine was after school.  Now the child limits the information she provides the mother and tests her limits with the grandmother.  Since the detention, the mother feels Jasmine has been losing out on the family time they used to share with each other.  The mother has unmonitored visits with Jasmine throughout the week.  The mother sometimes picks up the child from school.  In addition, the mother takes Jasmine to the mall, takes her out to eat or brings food to the maternal grandmother's house.  The mother and child agreed to have dinner dates on Monday and Saturday.  Jasmine stated she missed the mother but sometimes did not want to spend time with her because they argued a lot.  The mother stated she and Jasmine do disagree usually because the mother does not allow Jasmine to do something or is calling the child's attention to certain behaviors.  At the meeting, Children's Social Worker Vanessa Acosta reminded the mother her visits with Jasmine were to be monitored.

D.  Jurisdiction and Disposition Hearing

At the jurisdiction and disposition hearing, the trial court heard testimony from Juana C., Gisselle V. and the mother.  Gisselle V. testified when she was 9 or 10 years old, the father fondled her breasts under her bra while driving her home.  Gisselle V. would sometimes ask Jasmine to come along on the rides with the father and her but Jasmine would decline.  The father fondled Gisselle V.'s genitals even when Jasmine was

13

in the car. Gisselle V. tried to move away when the father reached behind his seat to touch her. Gisselle V. stated the father touched her ten times. The father also touched her inappropriately in the pool. Gisselle V. also testified one time the father grabbed her hand and tried to make her touch his groin area but she pulled her hand away. She did not tell anyone about the incident because she was scared. Gisele continued to visit Jasmine after the incident because she had fun with Jasmine.

A year after the first car ride incident, she told her friends about the molestation. Gisselle V. told her friends the father would show her his penis when she was underwater in the pool. Jasmine also was in the pool with them. Gisselle V. also told her friends that the father would touch her either in the front seat or the back seat of his vehicle. One of the friends told her mother who then spoke with Gisselle V. Gisselle V. was scared of how her mother would react but she told her mother about the molestation. Gisselle V. stopped visiting Jasmine after Gisselle V. told her mother about the sexual abuse. Gisselle V. testified she told Jasmine twice about the molestation in gymnastics class. Also, Gisselle V. stated Jasmine replied it was not such a big deal because the father also touched Jasmine's genitals. However Jasmine told Gisselle V. it was an accident.

The mother testified she became aware of Gisselle V.'s allegations in 2009. When asked about the allegations, the mother replied Gisselle V. was being mean to Jasmine. She stated, "My daughter came home and said Gisselle V. was being mean with her and said that her dad was a pervert or something like that." The mother asked Jasmine what Gisselle V. meant but the child did not want to talk about it. The mother asked the father what happened with Gisselle V. The father replied he did not know what Gisselle V. was talking about. The mother testified she wrote the letter to her husband and admitted she accused the father of being sexually inappropriate with some women. The mother did not know why she wrote Gisselle V.'s mother "could have pressed charges." The mother later stated she wrote that because she was angry with the father. The mother assumed Gisselle V. stopped coming over to her house because the family no longer had a swimming pool. Jasmine told the mother that Gisselle V.'s mother did not want Gisselle V. to come over anymore.

14

The mother denied the father had been sexually inappropriate with other women. The mother testified she was angry with the father and wrote the letter because he had invaded their housekeeper's space. She denied the father groped Maria R. The mother admitted she sent text messages to Maria R. stating that social services could have the housekeeper deported.

The mother also testified about the foster child, Juana C. The mother stated Juana C. lived with the family from August 2010 until February 2011. Juana C. was removed from the home because she lied at home and in school and had fake fainting spells. The mother stated she asked for Juana C. 's removal in December 2010 but it was not until Juana C. 's last hospitalization in January that Juana C. was removed from the family's home. The mother explained she let Juana C. continue to visit because the social worker insisted on letting Juana C. come back for overnight visits. The mother stated she felt sorry for Juana C. and her brother and she wanted to facilitate visits with their mother.

The mother acknowledged she wanted her husband to go to counseling. She explained he had "a very sad childhood" and she wanted him to "vent and explain" to someone about his issues. The mother denied Jasmine ever told her that the father touched the child inappropriately.

After hearing the testimony and oral argument, the trial court stated it did not find Juana C.'s testimony believable. The court found Gisselle V. "to be very credible." The trial court found the mother was aware of Gisselle V.'s allegations. The court stated: "[The mother] does try to cover up for the father and make up excuses. [¶] I can't understand what else in her letter to the father is referring to we could be sued. The family could be in trouble because of allegations made by Gisselle, what could [it] mean other than she was aware of the nature of Gisselle not coming to the house had to do with inappropriate touching or inappropriate sexual conduct. [¶] I can't understand why else she thought the family would be subject to being sued, that is the problem which I have, and so because of that, I am going to have to find mother was aware that at least one child had made comments before or one family was concerned about inappropriate touching

15

and inappropriate conduct with their daughter and she allowed the father to remain in the home with her daughter."

The juvenile court denied the mother's request that the child be placed in her custody. The court found clear and convincing evidence there was substantial danger if the child were returned to the care and custody of the parents. Also, the court found there were no reasonable means by which the child's physical and emotional well-being could be protected without removal. The juvenile court explained: "I would like to see mother reach a stage in her therapy. I think she is going to be getting there, that she acknowledges what has occurred and that she will protect her daughter in the same way that she is concerned about protecting [the father]." The court further stated: "I am just not prepared to say that mother will be able to protect Jasmine. I am not. Jasmine is a 14-year old and is not able to protect herself and with other adult women and they have not been able to at least, allegedly haven't, and I would like to see a letter. I would like to see some substantial progress made in mother's therapy . . . ."

## IV. DISCUSSION

### A. Standard of Review

We review the juvenile court's jurisdictional findings for substantial evidence. (*In re E.B.* (2010) 184 Cal.App.4th 568, 574-575; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1433.) We review a removal order for substantial evidence in a light most favorable to the juvenile court's order to determine whether sufficient evidence supports the court's findings by clear and convincing evidence. (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969; *In re Mariah T.* (2008) 159 Cal.App.4th 428, 441.) Substantial evidence is relevant evidence which adequately supports a conclusion; it is evidence which is reasonable in nature, credible, and of solid value. (*In re E.B., supra,* 184 Cal.App.4th at p. 575; *In re J.K., supra,* 174 Cal.App.4th at p. 1433.) We draw all reasonable inferences from the evidence to support the findings and orders of the juvenile court and adhere to the

16

principle that issues of fact, weight and credibility are the provinces of the juvenile court. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393; *In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.)

## B.  Jurisdictional Findings

Section 355, subdivision (a) provides: "At the jurisdictional hearing, the court shall first consider only the question whether the minor is a person described by Section 300.  Any legally admissible evidence that is relevant to the circumstances or acts that are alleged to bring the minor within the jurisdiction of the juvenile court is admissible and may be received in evidence.  Proof by a preponderance of evidence must be adduced to support a finding that the minor is a person described by Section 300 . . . . "

Section 300, subdivision (b) states:  "Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶]  . . . (b) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child. . . ."   To establish jurisdiction under section 300, subdivision (b), the department must prove by a preponderance of the evidence that:  there was neglectful conduct by the parent in one of the specified forms; causation; and "serious physical harm or illness" to the child or "substantial risk" of such harm or illness.  (*In re B.T.* (2011) 193 Cal.App.4th 685, 692; *In re Ricardo L., supra,* 109 Cal.App.4th at p. 567; *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

Section 300, subdivision (d) provides a child is a dependent if "[t]he child has been sexually abused, or there is substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by his or her parent or guardian or a member of his or her household, or the parent or guardian has failed to adequately protect the child from sexual abuse when the parent or guardian knew or reasonably should have known that the child was in danger of sexual abuse."

The mother does not challenge the jurisdictional findings as to the father but challenges the findings relating to her. A child is a dependent of the court if the conduct of either parent endangers the child in the manner described by one of the subdivisions of section 300. (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491-1492; *In re X.S.* (2010) 190 Cal.App.4th 1154, 1161; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.) Thus, the juvenile court has jurisdiction where the acts or omissions of either parent brings the child within section 300. (*In re Maria R.* (2010) 185 Cal.App.4th 48, 60; *In re John S.* (2001) 88 Cal.App.4th 1140, 1143.) Here, we discuss the mother's contentions because the jurisdictional findings as to the mother are relevant to her appeal of the removal order. (*Ibid.*)

The mother argues the jurisdictional findings under section 300 subdivisions (b) and (d) are not supported by substantial evidence. She argues there was insufficient evidence to support the court's finding she knew of the father's sexual abuse of the unrelated minor Gisselle V. and failed to protect Jasmine. The mother admits she became aware of Gisselle V.'s allegations in 2009 when Jasmine came home and complained Gisselle V. had called the father a pervert. But Jasmine did not tell the mother that Gisselle V. had been touched in her private parts. Also, the mother admits she wrote in her letter to the father the statement, "Gisselle what exactly did you do to her don't really know but her mom could have pressed charges." But the mother argues neither Gisselle V. nor Gisselle V.'s mother ever told the mother about the sexual abuse.

We conclude substantial evidence supports the jurisdictional findings as to the mother. Jasmine stated in fifth grade she told her parents Gisselle V. had accused the father of touching her private parts. The mother knew Gisselle V. had told Jasmine the father was a pervert. The mother stated: "One day about five years ago that Gisselle girl said something about my husband to Jasmine. Jasmine came home and said that her father is a pervert because they were playing I guess in the pool and he had put [Gisselle V.] up while holding her butt. I asked my husband about it and he said they were just playing all in good faith [,] nothing malicious about it." The mother admitted she wrote Gisselle V.'s mother "could have pressed charges" in her letter to the father. In addition,

18

the mother attempted to interfere during Jasmine's interview with Detective Macias and the social worker. When Detective Macias told the mother to wait outside, the mother got upset, walked up to the child, grabbed the child her face and stated, "Remember what I told you!" Detective Macias became upset and told the mother to stop threatening the child. The mother then left the room but watched the interview through a window.

Also, the mother's awareness of the father's inappropriate sexual behavior with other females supports the finding the mother knew of the father's sexual abuse of Gisselle V. In her letter to the father, the mother discussed the father's sexual harassment of her two cousins, Sandra and Veronica. Sandra visited the mother's family about 20 years ago from Mexico when she was about 10 or 11 years old. Sandra accused the father of grabbing her buttocks. Veronica accused the father of walking into her apartment unannounced when she was naked about 20 years ago when she was 20 years old. In addition, Maria R., the family housekeeper, informed the mother of the father's inappropriate sexual behavior towards her. Further, the mother knew her former 15-year-old foster child, Juana C. had accused the father of touching her inappropriately.

Unfortunately, rather than protect Jasmine from the father, the mother maintained the sexual abuse allegations were fabricated and false. The mother expressed concern for the father, stating: "The main thing for me is how is he going to be able to function normally. The trauma for him to be charged with such a hideous crime. I worry about the trauma he is going to endure." Instead of holding the father accountable for his sexually inappropriate actions, the mother believed the women he harassed were flirtatious or dressed provocatively. In addition, the mother thought Maria R. fabricated the allegations because the housekeeper was jealous and envious of her. We conclude ample evidence supports the juvenile court's jurisdictional findings under section 300, subdivisions (b) and (d).

## C. Removal Order

Section 361, subdivision (c)(1) provides: "A dependent child may not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . . : [¶] (1) [t]here is or would be a substantial danger to the health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." The purpose of the statute is to avert harm to the child. The parent need not be dangerous nor the child actually harmed before removal is appropriate. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917; *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748 fn. 6.) The juvenile court may consider both the parent's past conduct and the present circumstances. (*In re Cole C., supra,* 174 Cal.App.4th at p. 917; *In re S.O.* (2002) 103 Cal.App.4th 453, 461.)

The mother argues the juvenile court's findings and removal order were not supported by clear and convincing evidence. She contends both parents are willing to comply with the court orders and the case plan. The mother also asserts she has cooperated with the department and participated in services to address case issues. She has been in individual therapy since February 2, 2010 and has consistently attended therapy. Also, the mother has attended five sessions each on managing children's behavior, parents managing their emotions, and building children's confidence. In addition, she argues the father had moved out of the family home and was living with the paternal aunt as of April 1, 2012.

We conclude substantial evidence supports removal of Jasmine from the mother's physical custody. The parenting courses mother attended do not address sexual abuse. Also, the mother attended 17 psychotherapy sessions but had only recently discussed various aspect of sexual abuse with her therapist. And it is unclear whether the sexual

20

abuse discussed in therapy related to the molestation the mother suffered when she was four years old or the sexual abuse perpetrated by the father. The mother stated the father was innocent and the sexual abuse allegations were fabricated and false. The mother excused the father's behavior by stating the other women mentioned in her letter were flirtatious, dressed provocatively or were jealous and envious of the mother. Rather than acknowledge the father's behavior, the mother expressed concern about his ability to deal with the "trauma" of being "charged with such a hideous crime."

Contrary to the mother's assertion, she did not fully cooperate with the department's investigation or comply with all court orders. The mother sought to be present at Jasmine's initial interview and became upset when Detective Macias told her to leave the room. The mother walked up to the Jasmine, grabbed the child's face and told her, "Remember what I told you!" The mother left the room after Detective Macias told her not to threaten Jasmine but she watched the interview through the window. In addition, the mother refused to answer questions from the social worker about the father's inappropriate conduct with females other than Maria R. And the mother accused Maria R. of fabricating the allegations stating the housekeeper was vengeful and jealous of her. Also, the mother sent threatening text messages to Maria R. after the housekeeper told the police about the father's sexually inappropriate behavior. In addition, the mother failed to comply with a court order by having unmonitored visits with Jasmine when the court ordered monitored visits. We conclude there was clear and convincing evidence showing the mother cannot ensure Jasmine's protection if the child is placed in her custody.

## V. DISPOSITION

The juvenile court's jurisdictional and dispositional findings and orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


O'NEILL, J.[*]


We concur:


ARMSTRONG, Acting P.J.


KRIEGLER, J.

---

[*] Judge of the Ventura Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.